MARY A. WITHERS, Respondent, v. LAFAYETTE COUNTY BANK, Appellant.

67 115
78 467
---
67 115
89 269

Kansas City Court of Appeals, May 18 and June 15, 1896.

1. **Banks and Banking:** SHARES: CERTIFICATES: PLEADING. A certificate of stock in a corporation is a muniment of title to the shareholder and the refusal to issue certificates to the owner of the stock is such conversion of the stock that an action will lie therefor; and a petition alleging that certificates were fraudulently and without authority canceled and that the corporation refused to issue others in lieu thereof, states facts sufficient to constitute a cause of action.

2. ————: CERTIFICATES OF STOCK: CONVERSION. The facts in this case are reviewed and *held* sufficient to send the case to the jury on the issue whether the defendant bank had converted the shares of plaintiff's stock by refusing to reissue certificates therefor.

3. ————: KNOWLEDGE OF PRESIDENT. Where the president of a bank, as agent of a shareholder, has such shareholder's certificates canceled and new certificates issued to himself as transferee, he is acting in a double capacity and the bank is bound by his knowledge of the fraud in his authority to represent the shareholder.

4. ————: CONVERSION OF STOCK: DEMAND. Where the bank has knowledge of the fraud in the transfer of stock, no demand is necessary before action for conversion; but, if necessary, there was sufficient demand in this case.

*Appeal from the Lafayette Circuit Court.*—HON. RICHARD FIELD, Judge.

AFFIRMED.

*Alexander Graves* and *B. Wells* for appellant.

(1) The petition does not state facts sufficient to constitute a cause of action. (2) The demurrer to the evidence should have been sustained. The fraud alleged in the petition did not appear in the evidence. No knowledge of respondent's dissatisfaction was brought to appellant before suit. Five years' silence was acquiescence. *Dickerson v. Colgrove*, 100 U. S. 580; *Garnhart v. Finney*, 40 Mo. 449; *Gaslight Co. v. St. Louis*, 46 Mo. 121; *Highley v. Barron*, 49 Mo. 103; *Pilkington v. Ins. Co.*, 55 Mo. 171; *Justice v. Lancaster*, 20 Mo. App. 559. (3) This is not conversion. *Carey v. Bright*, 58 Pa. St. 70; *Shotwell v. Few*, 7 John. (N. Y.) 302; *Sargent v. Gile*, 8 N. H. 325; *O'Connell v. Jacobs*, 115 Mass. 21; *Carrol v. Mix*, 51 Barbour, 212; *Dowd v. Wadsworth*, 2 Day (Conn.), 130; *Blankenship v. Berry*, 28 Tex. 448; *Green v. Dunn*, 3 Campbell, 215. (4) The demand was not legal. 4 Am. and Eng. Encyclopedia of Law, 115, and cases there cited. 3 Bouvier's Inst. No. 3530. *Phillips v. Robinson*, 4 Bing. 106; *Bryden v. Burke*, 55 U. S. 575; *Telegraph Co. v. Davenport*, 97 U. S. 369; *Bayard v. Bank*, 52 Pa. St. 232; Cook on Stock and Stockholders, sec. 387; Cook on Stock and Stockholders, sec. 576; *Bank v. Railroad*, 21 Ohio St. 221.

*J. D. Shewalter* for respondent.

(1) Did Mrs. Withers authorize or consent to Wilson placing her signature on the back of the old certificates authorizing their cancellation? If so, plaintiff has no case. If she did not, and it was done by Wilson without her knowledge, especially if done in the face of her express refusal, then plaintiff is entitled to recover. This is the whole question; and this ques-

tion is one of fact alone. It was submitted to the jury on proper instructions, and the finding of the jury on this question of fact is final. (2) No authorities are necessary on the proposition that if a corporation illegally cancels certificates of stock, this constitutes a conversion, and the corporation is liable after demand. It is immaterial whether we call it "stock," or "certificates," the conversion consists in the cancellation or annulment of the evidence of title—the destruction of the paper title. *Hamlin v. Carruthers*, 19 Mo. App. 567, 571; *Koch v. Branch*, 44 Mo. 542; *Williams v. Wall*, 60 Mo. 318.

SMITH, P. J.—It is, in substance, alleged in the plaintiff's petition that the defendant was a banking corporation and that the plaintiff was the owner of twenty shares therein, each of the par value of $100. It was further alleged that the defendant, fraudulently acting in collusion with its president, George Wilson, and without any authority whatever, and in violation of its by-laws, annulled said certificates, which had been left for safe-keeping in the hands of defendant and its president George Wilson, and that "plaintiff has demanded the said stock and the certificates therefor to be issued to her, with which request the defendant had failed to comply." Wherefore, etc.

The appealing defendant objects that the said petition does not state facts sufficient to constitute a cause of action.

In *Vanstone v. Goodwin*, 42 Mo. App. 39, it was said by us that a "certificate of stock is a muniment of title. A share is a species of incorporeal, intangible property in the nature of a chose in action. * * * The title to the shares may exist without the certificates, the certificate being only the evidence of the title of the shareholder." In *McAllister v. Kuhn*, 96

U. S. 87, it was said that: "There can be no doubt that the shares of stock in a corporation may be transferred by means of an assignment and delivery of certificates. It is true that a certificate of stock is not stock itself, but it is documentary evidence of title to stock and may be used for the purpose of symbolical delivery, as the stock itself is incapable of actual delivery. A blank indorsement of a certificate may be filled up by writing an assignment and power of attorney over the signature indorsed, and in this way an actual transfer of the stock in the books of the corporation may be perfected. *A wrongful use of such an indorsed certificate for such purpose may operate as a conversion.*"

It is well established that refusal of a corporation to register a transfer in the name of one entitled to the stock is a conversion of the shares. And so the refusal of a corporation to issue a certificate of stock to an original subscriber, who is, by the terms of the contract of subscription, entitled thereto, may be treated as a conversion. Cook on S. & S. & Corp., section 576. And in section 137, Lowell on Transfer of Stock, it is stated: "If a corporation refuses, without lawful excuse, to transfer stock upon its books, or to issue a certificate to the purchaser, the latter may treat the refusal as a complete denial of ownership and he may thereafter sue the corporation and recover the full value of the stock, as in a suit for the conversion of a chattel at common law." And the same rule is recognized in *Keller v. Mfg. Co.*, 43 Mo. App. 84; *Watson v. Printing Co.*, 56 Mo. App. 145; *Trust Co. v. Lumber Co.*, 118 Mo. 447.

A corporation itself may interfere with the rights of the stockholder by simply denying them, and thus become liable for conversion. Lowell on Transf. of Stock, sec. 14, and cases cited.

In *Budd v. Railroad*, 12 Oregon, 271, it is said:

"A share, then, exists in legal contemplation and is personal property, which may be dealt with, enjoyed, and subjected to judicial process as such, and of which the certificate is not property itself, but only documentary evidence of title to it. Being thus impressed by law with the attribute of personal property, recognized as such, capable of being enjoyed, dealt with, and subjected to judicial process, it would seem to follow that whenever there has been some repudiation by the defendant of the owner's right to the share, or some exercise of dominion or control over it inconsistent with such right, he is guilty of a conversion and ought to be liable in trover.

A conversion is defined to be "a wrong consisting in dealing with the property of another as if it were his own, without right." Abbot, Law Dict. "Conversion." Judge Cooley defines it to be: "Any distinct act of dominion wrongfully exerted over one's property, in denial of his right, or inconsistent with it, is a conversion." Cooley on Torts, 448. Mr. Bigelow says: "It may be laid down as a general principle that the assertion of title to or an act of dominion inconsistent with the right of the owner, is conversion." Bigelow, Lead. Cases, 428. Same effect is *Dusky v. Rudder*, 80 Mo. 400. Nor is it necessary to show a manual taking of the thing in question, nor that the defendant has *applied it to his own use*.

The petition, in alleging that the defendant had fraudulently and without authority canceled her certificates of stock and refused to issue others to her in lieu thereof, when tested by the rules just referred to, alleges facts sufficient to constitute a conversion, or at least facts from which a conversion may be inferred. In Pennsylvania it is held that a share of stock, being intangible, is incapable of being taken and wrongfully converted to the use of another. *Sewell v. Bank*, 17

Berg. & R. 285; *Neiler v. Kelly*, 69 Pa. St. 407.     But the best considered cases elsewhere hold that an action is maintainable for the conversion of a share of stock, which the certificate represents, as well as that of the certificate.     *McAllister v. Kuhn, ante; Budd v. Railroad, ante; Payne v. Elliot*, 56 Cal. 339.

The defendant further contends that if plaintiff's certificates were wrongfully canceled by defendant, her remedy is by suit in equity for the reissue of the same.     It is a sufficient answer to this contention to say that in such case plaintiff would have two remedies—one by an action against defendant for damages for conversion of her shares, and the other by a suit in equity to compel the issue of new certificates and to admit her to the rights of a shareholder. *Keller v. Mfg. Co.*, 43 Mo. App. 84, and authorities there cited.     So that the defendant's objection to the petition is not well taken.

The defendant further objects that the trial court erred in overruling its demurrer to the evidence. Turning to the evidence presented by the abstract of the record, and we find that it tends to prove that the plaintiff, at the time of the transaction, which gave rise to the present suit, was a widowed lady, seventy-six years of age, who had lived long enough to be a mother, a grandmother, and a great grandmother. She was the owner of considerable real and personal property.     It would seem that she had no child or grandchild, whom she could or would intrust with the transaction of her business.     It appears that during the year 1890 she was not in the enjoyment of her usual health and so spent much of her time visiting various health resorts.     It further appears from numerous letters given in evidence, that during this time the business relations between said George Wilson and herself were of a very close and confidential nature.     She

transacted her banking business with him and freely consulted and advised with him in respect to her business matters generally.

It further appears that on the twenty-second day of May, 1889, she purchased twenty shares of stock in the defendant bank, of which said Wilson was then president, and two certificates were accordingly issued to her therefor, but whether such certificates were ever delivered to her by Wilson or defendant, or, if so, when the same were redelivered by her to either or both of them, does not clearly appear.

The certificates were introduced in evidence and were marked canceled December 25, 1890. On the back of one of them was an indorsement assigning the same "to George Wilson, as trustee for Marquis W. Smith, my grandson," and authorizing him "to make the necessary transfer on the books of the bank." And on the back of the other was an assignment of the same to said Wilson, as "trustee for Robert Lee Smith, Jr., my great grandson," with a like authority to make the necessary transfer on the books of the bank. Both of these indorsements were signed "Mary A. X Withers," and witnessed by her daughter, Mary E. Smith. There was evidence adduced tending to prove that in the absence of the plaintiff, and at the defendant's bank, the said George Wilson wrote the name of the plaintiff to the indorsements on the certificates and then requested Mrs. Smith to witness the same by signing her name thereto, which she accordingly did. It further appears that the plaintiff then and for some months thereafter was able to and did write her own name, when she had occasion to do so. It further appears that on the twenty-sixth day of December, 1890, one day later, the said George Wilson visited the plaintiff at her room in her hotel, where she was con-

fined to her bed by sickness and there produced a writ-ten instrument for the plaintiff to sign, creating a trust, and in which it was recited that on the twenty-sixth day of December (one day after the date of the indorsement just referred to) plaintiff had delivered to George Wilson two certificates of stock in defendant's bank for ten shares each in her name and had directed that the same be canceled and two new certificates of ten shares each be issued to George Wilson, as trustee, respectively, for her said grandson and great grandson. Ten shares of the stock so placed in trust were, by the terms of the instrument, to be held until one of the beneficiaries should "become settled in temperate habits" and the other ten shares were to be held until the other should attain his majority.

There were many details provided for the adminis-tration of the trust so to be created, which it is unnec-essary to state. The concluding paragraph of the instrument was to the effect that: "I hereby ratify the transfer and issue of new certificates * * * here-tofore issued on the twenty-sixth day of December, 1890." The plaintiff refused to sign the instrument. There was also evidence tending to show that at the time the said Wilson presented the said instrument, he had with him the two new certificates of stock issued to himself as trustee, but it does not appear that the plaintiff knew the latter fact, or, indeed, that such cer-tificates had been issued. The trust instrument and the new certificates were found afterward in the plain-tiff's room by her grandsons and by them produced at the trial. It does not appear that the plaintiff herself, or anyone for her, ever accepted such certificates.

The plaintiff was at the time of the trial and for several years prior thereto had been, a helpless invalid, confined to her bed with chronic paralysis. She was not able to be present in court to testify, or to give her

deposition. It further appears that a short time previous to the date of the cancellation of the plaintiff's stock, she had lost confidence in said Wilson and his bank and had become distrustful of both. On January 9, 1891, she drew her check for her balance in defendant's bank in favor of another bank. This check went to protest. It appears that two days after this occurrence, the sheriff of Lafayette county, at the instance of the said George Wilson, filed an information in the proper court alleging that the plaintiff was of unsound mind and incapable of managing her affairs, etc. The matter was inquired into by a jury, who by their verdict found plaintiff to be of sound mind. It appears from a paper filed in that proceeding, that the plaintiff was then able to write and had subscribed her name thereto.

There was testimony showing that at the inquiry into the sanity of plaintiff, said George Wilson, who testified as a witness, was asked whether or not he had tried to have important business with plaintiff shortly before the last day of December, 1890, about the transferring of some stock in his bank, and he replied that that was Mrs. Smith's transaction. It was further shown that at the time of the production to plaintiff of said written instrument by said Wilson, the former's great grandson was only seven years old. It was admitted by defendant at the trial that it had not paid a dividend on its stock since the plaintiff's purchase, nor for two years previous thereto, and also that plaintiff's shares of stock, at the time of the conversion, were worth $2,000.

The day before the commencement of this suit, the plaintiff demanded in writing of defendant that it issue to her certificates for twenty shares of stock, which it had theretofore illegally canceled. This demand was made of said defendant's president. No response was

made thereto.    It further appears that plaintiff's attorney, in the year 1892, told said Wilson that he had been employed by plaintiff to bring suit against him or his bank in reference to her stock, and if it was not settled, he would do so.    The evidence tends to prove a great number of other facts, which might be added to the foregoing group, but this we deem unnecessary, since we think these facts, with the inferences to be drawn therefrom, were sufficient to carry the case to the jury.

The concluding paragraph in the instrument creating the proposed trust conclusively shows that plaintiff had neither placed her signature to the assignment and power of attorney indorsed on the back of the original certificates of stock, nor authorized Wilson to do so for her; for, if so, why did he request her to sign said instrument reciting that:    "I hereby *ratify* the transfer and issue of the new certificates," for the twenty shares of stock.    If there had been no assumption of an authority not conferred by plaintiff in the first instance, what occasion was there for ratification? It was a confession of the want of a previous authority by him to execute the assignment and power of attorney and to cancel the original certificates and issue the new ones to himself, as trustee.    Coupling with this confession the testimony of the witness, Mrs. Smith, and that of said Wilson, made at the inquest relating to the sanity of the plaintiff, which was, as already stated, to the effect that the plaintiff did not affix her name to the assignment and power of attorney indorsed on the certificates, nor authorize the said Wilson to do so, and we have convincing proof that the said assignment and power of attorney was a fabrication of Wilson, and especially so when it is remembered that plaintiff was, at the date of the said assignment and

power of attorney, quite able to sign her own name, when required by the demands of her business.

At and long before the time when the plaintiff's certificates of stock were canceled, the said Wilson was the president of the defendant and the trusted and confidential agent of the plaintiff, and he therefore acted, in the matter of the cancellation of plaintiff's said certificates, in a double capacity. As president of the bank, he canceled the old stock certificates and issued the new ones to himself, as trustee, and his knowledge of the fabrication of the assignment and power of attorney by himself must be imputed to the bank. The defendant must be held to have had full knowledge of the fraud perpetrated by its president, both in the fabrication of the assignment and power of attorney and in the cancellation of the original stock certificates. *Leonard v. Latimer*, 67 Mo. App. 138, and *Smith v. Farrell*, 66 Mo. App. 8. It will not therefore do to say that the defendant did not participate in the fraud and wrong of Wilson and should not therefore be held therefor. The act of the defendant, in thus canceling the plaintiff's certificates of stock was, within the meaning of the authorities hereinbefore adverted to, an actual conversion of the plaintiff's shares of stock, and made a demand for the reissue, as a condition precedent to the plaintiff's right of action, unnecessary. Phillips on Code Plead., secs. 105, 395; *Wimberly v. Pittner*, 66 Mo. App. 633. And if a demand were necessary, we think that disclosed by the evidence was timely and sufficient.

The court gave all the instructions asked by either party. They were consistent and harmonious expressions of the law as applicable to the facts the evidence tended to prove. The instructions taken in their entirety very fairly submitted every conceivable issue of fact in the case to the jury.

We do not well see how the jury could have found a different verdict. The judgment must be affirmed. All concur.

### ON MOTION FOR REHEARING.

PER CURIAM.—The by-laws passed by the defendant's board of directors conferred upon its president and cashier the power to sign and stamp with the seal of the defendant, certificates of stock. When certificates of stock were assigned, these officers were authorized to record such assignment on the defendant's book and to issue new certificates. They were consequently the transfer officers of defendant. In the present instance, the president of the bank was, by virtue of his office, the executive agent of the board of directors (Boone on Banking, sec. 99); and the cashier was the executive officer of the bank. *Bank v. Hughes*, 62 Mo. App. 576; *Windsor v. Bank*, 17 Mo. App. 665. We have, as we think, sufficiently demonstrated in the opinion that the assignments indorsed on the plaintiff's certificates of stock were false and fraudulent and that this fact was known to the president and that his knowledge was that of the defendant.

The case, restated, is that the defendant, with this knowledge by its officer, authorized to act in the matter of the transfer of shares of stock on its books, and to issue and certify to the new certificates, canceled the plaintiff's certificates, transferred her stock on its books to its president, and issued new certificates to him as transferee; and when called upon to reissue to plaintiff certificates of stock in the place of those wrongfully canceled, refused to do so. This was, within the meaning of the authorities cited in the opinion, a conversion of the plaintiff's shares, for which defend-

ant was liable.  Lowell on Transfer of Stock, secs. 144, 14, 157, and cases cited.

The cases to which defendant calls our attention in its brief for a rehearing are not analogous in their facts to this case, as will be readily seen by an examination of them.

The defendant is in error in its assumption that we overlooked the point suggested by its motion, to the effect that there was no evidence adduced to connect the defendant with the fraudulent cancellation and wrongful transfer of the plaintiff's stock, etc., as will appear by reference to what is said in the opinion, to which we are constrained to adhere.  Motion denied.